## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

MASON G., *by and through his parents,*
*Joseph G. and Melissa G., and*
*Joseph G. and Melissa G. in their own*
*capacity*,

                     Plaintiffs,

     v.

WESTERN WAYNE SCHOOL
DISTRICT,

                     Defendant.

CIVIL ACTION NO. 3:22-CV-00004

(MEHALCHICK, J.)

## <u>MEMORANDUM</u>

Presently before the Court are cross-motions for judgment on the administrative record filed by Mason G. ("Mason"), by and through his parents, Joseph G. and Melissa G., and Joseph G. and Melissa G. in their own capacity ("Mason's Parents") (with Mason, collectively "Plaintiffs") and Defendant Western Wayne School District (the "District"). (Doc. 28; Doc. 33). On January 3, 2022, Plaintiffs filed the instant civil action ("Complaint") against the District alleging violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and seeking to appeal the decision of an administrative hearing officer (the "Hearing Officer"). (Doc. 1). (Doc. 28; Doc. 33). For the following reasons, Plaintiff's motion for judgment on the administrative record will be **DENIED** (Doc. 28), and the District's

motion for judgment on the administrative record will be **GRANTED in part**. (Doc. 33).

## I.   BACKGROUND AND PROCEDURAL HISTORY

The following background is taken from the Complaint and the administrative record, including testimony and the Hearing Officer's finding of facts. (Doc. 1; Doc. 8-1-14). Mason began his kindergarten year at the District in 2015. (Doc. 1, ¶ 47; Doc. 8-3, at 8). Mason's Parents requested that he receive extra support in reading and writing upon belief that he was struggling with those subjects. (Doc. 8-3, at 8). The District began to provide Mason with Title I reading intervention, reading support that is federally funded. (Doc. 8-3, at 8). By the 2016-2015 school year, Mason's first-grade year, he was still eligible for Title I services and continued his participation in the program. (Doc. 8-3, at 8).

In December 2017, during his second-grade year, Mason's mother requested that the District evaluate him for special education services. (Doc. 8-3, at 8). The District agreed to evaluate Mason, and on February 28, 2018, the District provided Mason's Parents with the 2018 evaluation report ("2018 ER") that concluded Mason did not qualify for special education services. (Doc. 8-3, at 8-9). Despite noting reversals in written letters and sounds of letters, the 2018 ER determined that Mason's successful grades, average test scores, and academic progress showed that he was accessing educational benefit without special education services. (Doc. 8-3, at 10; Doc. 32, at 8-10). Plaintiffs note that the 2018 ER did not evaluate Mason for speech and language needs and school personnel testified that Mason was not making progress in blended sounds to make words and using phonics to spell, areas where a student with Dyslexia would struggle. (Doc. 1 ¶¶ 57-60; Doc. 8-3, at 9-10; Doc. 8-8, at 46). The District notified Mason's Parents that if Mason continued to struggle in third grade, he could be placed in a co-taught regular and special education classroom. (Doc. 8-6, at 47).

2

At the start of the 2018-2019 school year, Mason began third grade, and the District placed Mason in a co-taught classroom. (Doc. 8-6, at 47). Mason's teachers, however, told Mason's Parents that his scores showed nothing to be concerned about. (Doc. 8-7, at 37). Mason's Parents continued to worry about Mason and obtained an independent evaluation for Mason on March 26, 2019 ("2019 IEE") (Doc. 8-3, at 11). The District held an individualized education program ("IEP") meeting on April 10, 2019 to discuss the results of the 2019 IEE, which showed concern for Dyslexia, reading skills, learning problems, executive functioning, and peer relations. (Doc. 8-3, at 11-14). During the meeting, Mason's Parents requested a new occupational therapy evaluation. (Doc. 8-3, at 14). The District agreed, and after considering both the new occupational therapy evaluation and the 2019 IEE results, the District once again found Mason ineligible for special education services for a specific learning disability ("SLD"). (Doc. 1 ¶¶ 68-72; Doc. 8-3, at 12; Doc. 8-8, at 52; Doc. 32, at 9). The District contends that differences in the results of the 2018 ER and 2019 IEE were "insignificant." (Doc. 1 ¶¶ 68-72; Doc. 8-3, at 12; Doc. 8-8, at 52; Doc. 32, at 9).

In fourth grade, during the 2019-2020 school year, the District provided Mason with reading intervention services by an intervention teacher for 20 minutes per day. (Doc. 8-3, at 15). These are not considered special education services, an IEP Plan, or a Section 504 Plan. (Doc. 8-3, at 15). On October 18, 2019, Mason's Parents and the District agreed to an independent auditory language processing evaluation, and on November 19, 2019, they agreed to another occupational therapy evaluation, which also found Mason ineligible for occupational therapy services. (Doc. 8-3, at 15). During a February 21, 2020 meeting, Mason's Parents requested another IDEA evaluation for special education services, to which the District agreed. (Doc. 8-3, at 16). The evaluation took place on April 29, 2020 and did not

3

include new assessments or a classroom observation due to pandemic school closures. (Doc. 8-3, at 16-17). The evaluation, which relied on teacher and parent observations, determined Mason did not qualify for services but acknowledged that new evaluations would be needed to correct for the missing information due to school closures. (Doc. 8-3, at 16-17). On August 25, 2020, the District reviewed results from the evaluation they conducted on Mason over the summer and found Mason eligible for SLD services in the area of oral reading fluency ("August 2020 ER"). (Doc. 8-3, at 18). The District created an IEP ("2020-2021 IEP") for Mason based on the results and offered it to him on October 12, 2020. (Doc. 8-3, at 21-22; Doc. 32, at 17). Thereafter, the District agreed to fund another independent speech and language evaluation, which recommended Mason receive a speech/language disability classification. (Doc. 8-3, at 22; Doc. 8-8, at 5). The District added the classification and added related speech/language goals to Mason's 2020-2021 IEP. (Doc. 8-3, at 22). The District issued the revised 2020-2021 IEP on January 5, 2021. (Doc. 8-3, at 23).

On January 27, 2021, Mason's Parents filed their due process complaint. (Doc. 8-3, at 23). Due process hearings in this matter concluded on August 17, 2021, and the Hearing Officer issued his decision on October 6, 2021, finding no Child Find violations and one FAPE violation for the District's failure to have an IEP in place at the start of the 2020 school year. (Doc. 8-3). For the violations, the Hearing Officer determined Plaintiffs to be eligible for a compensatory education award of one hour per day from the start of the 2020-2021 school year through October 12, 2020, when Mason's 2020-2021 IEP was put in place. (Doc. 8-3, at 34).

Between the due process hearings and the Hearing Officer's decision, Mason's Parents obtained another IEE ("2021 IEE") by Dr. Kara S. Schmidt, a licensed psychologist and

4

certified school psychologist. (Doc. 18-2). The 2021 IEE found Mason eligible for IDEA services with an SLD and additionally diagnosed him with Developmental Coordination Disorder and Generalized Anxiety Disorder. (Doc. 18-2, at 15-16). Plaintiffs filed the instant civil action seeking reversal of the Hearing Officer's decision on January 3, 2022. (Doc. 1). The District filed a counterclaim and answer on March 22, 2022, seeking reversal of the portion of the Hearing Officer's decision finding that the District violated FAPE by not having an IEP at the start of the 2020-2021 school year. (Doc. 9). Mason's Parents supplemented the administrative record with the 2021 IEE on April 21, 2023. (Doc. 23). On July 21, 2023, Plaintiffs filed their motion for judgment on the administrative record and a brief in support (Doc. 27; Doc. 28). The District filed its brief in opposition and its own motion for judgment on the administrative record and brief in support regarding its counterclaim on September 19, 2023. (Doc. 32; Doc. 33; Doc. 34). Plaintiffs filed a reply brief and brief in opposition to the District's motion on October 26, 2023. (Doc. 39). Oral argument took place on July 29, 2024. Accordingly, the motions for judgement on the administrative record have been fully briefed and are ripe for disposition. (Doc. 28; Doc. 29; Doc. 32; Doc. 33; Doc. 34; Doc. 39; Doc. 43).

## II.   LEGAL STANDARDS

### A.   THE IDEA

The IDEA's purpose is to require states to "make available a free and appropriate public education to all children with disabilities residing within [the state's] borders." *D.S. v. Bayonne Bd. Of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010). This requirement is enforced through contingent federal funding to State Educational Agencies ("SEAs") and Local Educational Agencies ("LEAs"), such as the District, where eligibility for funding is conditioned upon submission of a plan demonstrating that the state complies with the IDEA. *See* 20 U.S.C. §§

1412, 1413. Thus, the IDEA strikes a bargain where, in return for federal government funds to educate students with disabilities, a state must comply with the IDEA.

The central premise of the IDEA is to provide a free and appropriate public education—a FAPE, for short—to every eligible disabled student. What constitutes a FAPE, however, depends upon the needs of each child. The statutory definition of a FAPE includes "special education," or a specifically designed instruction to meet the child's unique needs, and "related services," or support services required to help the child benefit from such instruction. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citing 20 U.S.C. §§ 1401(26), (29)). To implement these statutory requirements, a state must provide each child with an IEP, which is "the means by which special education and related services are tailored to the unique needs of a particular child." *Endrew F.*, 580 U.S. at 391 (internal quotation marks omitted); *see also* 20 U.S.C. §§ 1412(a)(4), 1414(d).

The IEP is "the centerpiece of the [IDEA]'s education delivery system for disabled children," and it must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *See Endrew F.*, 580 U.S. at 404. (internal citations omitted). That is, an IEP must be crafted such that the child may "achieve passing marks and advance from grade to grade." *Endrew F.*, 580 U.S. at 386 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203-04 (1982)) (internal quotation marks omitted). The IEP must provide the student with a "basic floor of opportunity," but need not rise to the level of providing the student with "the optimal level of services" or grant all of the parents' requests. *D.S.*, 602 F.3d at 557. Each IEP is required to include: (1) present levels of academic achievement and functional performance; (2) a statement of measurable annual goals; (3) how the child's progress toward meeting the annual goals is to be measured;

6

and (4) special education and supplementary aids and services, as well as other details regarding how the IEP will be implemented. *See* 20 U.S.C. § 1414(d)(1)(A)(i); *see also N.H. by & Through S.H. v. Phoenixville Area Sch. Dist.*, No. CV 21-1066, 2021 WL 5998445, at *1 (E.D. Pa. Dec. 20, 2021).

An LEA, such as the District, is tasked with developing the IEP. This process typically involves the child's parents and school personnel working together to identify the child's needs and to develop a plan to achieve educational goals. As noted by the Supreme Court, "parents play[ ] 'a significant role' in this process." *Winkelman*, 550 U.S. at 524. A child's IEP "should evolve with the child's development, and should be continually revised as appropriate." *Charlene R. v. Solomon Charter Sch.*, 63 F. Supp. 3d 510, 513 (E.D. Pa. 2014) (citing 20 U.S.C. § 1414(d)(4)). Thus, assessing the content and implementation of a child's IEP is crucial to the determination of whether a child was provided—or denied—a FAPE.

Once an IEP is finalized, a parent may accept or reject it. If the parents reject the IEP as failing to provide a FAPE, the parents may secure additional educational services, including placement in a private school, and next request a due process hearing before a state Administrative Law Judge ("ALJ"). *See* 20 U.S.C. § 1412(a)(1)(C)(iii); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)). At a due process hearing, the parents bear the burden of proving by a preponderance of the evidence that the student cannot receive a FAPE without the accommodations requested by the parents. The ALJ hears the testimony of lay and expert witnesses, receives documentary evidence, and ultimately issues a written decision with findings of fact and conclusions of law. 34 C.F.R. § 300.512(a)(5). Either party may challenge the ALJ's final decision by filing suit in a district court of the United States or the appropriate state court. 20 U.S.C. § 1415(i)(2).

For a district court to have subject matter jurisdiction over a claim pursuant to the IDEA, a claimant must first exhaust the administrative remedies available under the statute. *See Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) (citing *Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994)). This requirement "encourage[es] parents and the local school district to work together to formulate an IEP for a child's education." *Batchelor*, 759 F.3d at 275. Administrative remedies under the statute involve filing a complaint with the child's LEA, and corresponding SEA, and participating in a Due Process Hearing. *Batchelor*, 759 F.3d at 272; *see also* 20 U.S.C. §§ 1415(a), (b)(6)(A), (f)(1)(A). "Upon receipt of a proper due process complaint, the SEA assigns the matter to a special education hearing officer who schedules a due process hearing." *Latisha G. v. Pennsylvania Leadership Charter Sch.*, 244 F.Supp.3d 421, 425 (E.D. Pa. 2016). At the close of the due process hearing, the hearing officer will enter a decision. If either the child's parents or the LEA are dissatisfied with the decision, they "have the right to bring a civil action with respect to the [due process] complaint . . . in a State court of competent jurisdiction or in a district court of the United States," as Plaintiffs have done in this case. *See Latisha G.*, 244 F.Supp.3d at 425.

Among the remedies available under the IDEA are compensatory education and tuition reimbursement. Compensatory education is an equitable remedy in which a child is given additional education hours to make up for deficient hours of schooling when not provided a FAPE. *See Ferren C. v. School Dis. Of Philadelphia*, 612 F.3d 712, 717 (3d Cir. 2010). "A court award of compensatory education requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation." *M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir. 1996).

8

B.   SECTION 504 AND THE ADA

Section 504 similarly requires that schools provide a FAPE to students with disabilities in Pennsylvania. *See P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) (Section 504 "protects the rights of disabled children by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements, like the IDEA."); *Gwendolynne, S. Through Judy S. v. W. Chester Area Sch. Dist.*, No. 19-CV-3844-JMY, 2021 WL 949483, at *2 (E.D. Pa. Mar. 12, 2021) ("under Section 504, recipients of federal funds must 'provide a [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.'"), *aff'd sub nom. G. S. through Judy S. v. W. Chester Area Sch. Dist.*, No. 21-1680, 2022 WL 2233909 (3d Cir. June 22, 2022) (quoting 34 C.F.R. § 104.33(a)). FAPE requirements under Section 504 and the ADA are materially the same as those under the IDEA. *See Richard S. v. Wissahickon Sch. Dist.*, 334 F. App'x 508, 509 n.1 (3d Cir. 2009) ("Appellants' § 504 and IDEA claims are factually indistinguishable, and the resolution of the IDEA claim is therefore also dispositive of the § 504 claim."); *Gwendolynne S.*, 2021 WL 949483, at *14 ("Plaintiffs failed to establish that Gwendolynne was denied a free, appropriate education, [so] the Section 504 and ADA claims fail.").

C.   STANDARD OF REVIEW

Under the IDEA, "[any] party aggrieved by the findings and decision" of the state administrative hearing examiner may bring suit in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In reviewing the complaint, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and

9

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

The standard for federal review of a state hearing officer's decision is "modified *de novo*," which is a "nontraditional standard of review." *D.S.*, 602 F.3d at 564 (citations omitted). The court exercises plenary review over the hearing officer's legal conclusions, *Colonial Sch. Dist. v. G.K. ex rel. A.K.*, No. 17-3377, 2018 WL 2010915, at *2 (E.D. Pa. Apr. 30, 2018), *aff'd*, 764 F. App'x 192 (3d Cir. 2019), but must give "due weight" to the hearing officer's factual findings. *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). The United States Supreme Court has construed 20 U.S.C. § 1415(i)(2)(C) to require that district courts give "due weight" to the administrative proceedings, while being careful to avoid replacing its "own notion[ ] of sound educational policy for those of the school authorities [that] they review." *Rowley*, 458 U.S. at 206. A hearing officer's findings of facts from the administrative proceedings "are to be considered *prima facie* correct." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (citations omitted).

In turn, however, if a reviewing court chooses to stray from any of the facts found by the hearing officer, the court "is obligated to explain why." *S.H.*, 336 F.3d at 270 (quoting *MM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 531 (4th Cir. 2002)). Taking these standards into account, "a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." *D.S.,* 602 F.3d at 564; *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (describing a district court's burden as "unusual" in that it must make its own findings by a preponderance of the evidence, but nevertheless afford "due weight" to the administrative officer's determinations). The

Court will apply the modified *de novo* standard of review to Plaintiffs' claims under the IDEA, Section 504, and the ADA. *Stephen O. v. Sch. Dist. of Philadelphia*, No. CV 20-1991, 2021 WL 6136217, at *11 (E.D. Pa. Dec. 29, 2021).

The parties dispute whether this Court should give deference to the Hearing Officer's decision. (Doc. 29, at 20-22; Doc. 32, at 22). Plaintiffs argue that Dr. Schmidt's September 2021 IEE, which the Hearing Officer did not consider in making his decision, expands the record and contradicts the Hearing Officer's decision. (Doc. 29, at 20). Plaintiffs therefore contend that this Court need not defer to the Hearing Officer's factual findings at all. (Doc. 29, at 17, 20-22). The District submits that the 2021 IEE is consistent with other evaluations considered by the Hearing Officer, as well as with the Hearing Officer's decision in its entirety. (Doc. 32, at 22).

To reiterate, "where the District Court hears additional evidence it is 'free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act.'" *S.H.*, 336 F.3d at 270 (quoting *Oberti* by *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993). It must still give "due weight" to administrative proceedings, even in instances with an expanded record. *See Oberti*, 995 F.2d at 1220. In other words, the deference due to a hearing officer's decision exists on a spectrum relative to the amount of and importance of new evidence provided by a party. *See Lauren W.,* 2005 WL 1353643, at *7, *aff'd sub nom. Lauren W.*, 480 F.3d 259 ("[t]he more a district court relies on the new evidence, however, the less it need defer to the findings of the administrative decision-makers.") (citing *Sch. Dist. v. Z.S.,* 295 F.3d 671, 675 (7th Cir. 2002)). New arguments can be addressed *de novo*, while giving weight to the administrative record on pieces still relevant. *See*

11

*Lauren W.*, 2005 WL 1353643, at *7 ("the parents have introduced new evidence in their pleadings related to these arguments; as such, the [c]ourt will address these arguments *de novo,* though pieces of the administrative record are relevant to its discussion."). Here, the Court will address whether the 2021 IEE is consistent with the Hearing Officer's decision based upon a *de novo* review of the 2021 IEE. However, this Court will exercise its discretion to give due weight to the Hearing Officer's factual findings regarding previous assessments and his decision in its entirety where it is consistent with the expanded record.

III.  DISCUSSION

Plaintiffs submit that the Hearing Officer's decision declining to find that the District violated its Child Find or FAPE obligations (outside of the August – October 2020 finding of a FAPE violation) conflicts with the newly admitted 2021 IEE and should be reversed. (Doc. 29, at 20). Plaintiffs therefore request that this Court award compensatory education for Child Find and FAPE violations that have occurred from 2019 through the present. (Doc. 29, at 22). The District argues that the 2021 IEE is consistent with the Hearing Officer's Child Find decision and FAPE decision (outside of the August – October 2020 finding of a FAPE violation). (Doc. 32, at 22). The District contends that no Child Find or FAPE violations occurred throughout the entirety of Mason's education at the District because the District continuously evaluated Mason over many years and Mason was not denied the benefits of his education. (Doc. 34, at 5). The District requests that the compensatory education award be reversed or reduced. (Doc. 34, at 5).

A.  THE 2021 IEE

The parties dispute whether the 2021 IEE is consistent with the Hearing Officer's decision. (Doc. 29, at 20-22; Doc. 32, at 22). Plaintiffs submit that the Hearing Officer erred

12

in concluding that the District did not violate its Child Find obligations because he wrongly stated that a school's Child Find obligations conclude after evaluating a student, even if the student is found eligible. (Doc. 29, at 22). Plaintiffs further argue that (1) objective data indicated Mason was struggling continuously in reading and writing before he was found eligible for special education services, (2) he was wrongly found ineligible for services, and (3) the District provided inadequate interventions. (Doc. 29, at 24-25). The District responds that the 2021 IEE "reinforces the findings in the District's August 2020 ER and supports the accommodations provided in the 2020 IEP." (Doc. 32, at 22-23). The District also notes that Plaintiffs do not provide evidence to refute the District's evaluations' compliance with IDEA requirements and that their conclusion that the 2021 IEE makes the District's evaluations deficient is not a sufficient legal argument on appeal. (Doc. 32, at 23-24, 28-29).

The 2021 IEE is consistent with the Hearing Officer's decision and would not change the outcome of that decision. Upon review of the expanded record before the Court and administrative record, though Plaintiff argues otherwise, the Court finds little evidence to support the assertion that the 2021 IEE conflicts with the Hearing Officer's dismissal of a Child Find claim or his FAPE findings.

Any findings related to Mason's needs at the time of the 2021 IEE do not implicate the District's past determinations or Mason's past needs, unless the District's past determinations reflect clear error. *Perrin v. Warrior Run Sch. Dist.*, 2015 WL 6746306, at *28 (M.D. Pa. Sept. 16, 2015) ("[A] plaintiff challenging the conclusions reached by professionals administering an educational evaluation must prove that the exercise of professional judgement was actually wrong, and not simply a matter of doubt."). This Court "may not rely on hindsight to second-guess an educational program that was reasonable at the time." *K.D.*

13

*by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018); *see also*

*Perrin*, 2015 WL 6746306, at *28 (same). Given the District's consistent evaluations of Mason

over several years and ongoing services, depicting careful choices about what best fit his

needs, the 2021 IEE is only relevant to whether Mason's needs were being met at the time of

the 2021 IEE, not from 2015-2020. As such, the 2021 IEE does not bear on the Hearing

Officer's decision regarding appropriate evaluations and services from 2015-2020.

Nevertheless, the 2021 IEE is still consistent with the Hearing Officer's decision.

      The 2021 IEE notes that "Mason presented with strengths in vocabulary/word

knowledge, verbal information about the world, semantic categorization skills, verbal

abstraction, visual pattern analysis, nonverbal reasoning skills, and hands-on spatial skills."

(Doc. 18-2, at 15). The 2021 IEE also concluded that "Mason demonstrated a pattern of

dysgraphia and dyspraxia (i.e., letter reversals, disorganized written output, difficulty with

bilateral hand movements) and meets criteria for Developmental Coordination Disorder."

(Doc. 18-2, at 15). The 2021 IEE recommended continued reading services and additional

services including accommodations in the areas of written language, math, working memory,

anxiety coping skills, and occupational therapy intervention and consultation. (Doc. 18-2, at

16-21). Dr. Schmidt made services recommendations that include the use of assistive

technology, preferential seating, broken down assignments, retrieval strategy guidance, copies

of notes, enlarged fonts, and testing accommodations. (Doc. 8-3, at 19-20; Doc. 18-2, at 16-

21). Plaintiffs contend that the 2021 IEE recommends services in addition to Mason's past

evaluations, specifically written language, math, working memory, anxiety coping skills, and

occupational therapy intervention and consultation. (Doc. 39, at 13-14). Finally, Plaintiffs

assert that the 2021 IEE differs substantially from the District's identification of his needs

because the 2021 IEE identifies needs associated "with memory, executive functioning, organization, and spelling" requiring "specially designed instruction to address spelling skills, writing mechanics (punctuation, capitalization, sentence structure/grammar, etc.) and essay organization (i.e., sequencing, organization, theme development)." (Doc. 39, at 13).

Contrary to Plaintiffs' arguments, these recommendations are reflected in the 2020-2021 IEP. First, the District was aware of Mason's struggles with letter reversals prior to the 2021 IEE. (Doc. 8-3, at 10; Doc. 8-7, at 21). However, during previous evaluations, Mason continued to do well academically and was testing in the average acceptable ranges relative to his intellectual ability. (Doc. 8-3, at 10-21; Doc. 8-6, at 27; Doc. 8-7, at 21, 27-29; Doc. 8-9, at 382-383, 386). Therefore, the District noted letter reversals and explained why Mason was still not eligible for special education services. (Doc. 8-3, at 10; Doc. 32, at 8-10). Second, the Hearing Officer correctly points out that the 2020-2021 IEP includes reading comprehension goals and was revised to include speech and language goals and services. (Doc. 8-3, at 21-23). A review of the record is consistent with the Hearing Officer's determination. (Doc. 8-9, at 377-453). Third, Mason's 2020-2021 IEP includes objectives and measurable goals in the areas of reading and fluency and was amended to include speech and language goals and services with monthly progress monitoring and data collection. (Doc. 8-9, at 377-453). Fourth, the 2020-2021 IEP also addresses fluency concerns, executive functioning, organization issues and a broad need for accommodations in class, noting "Mason needs to improve his oral reading fluency. Mason also requires classroom accommodations to address his identified Specific Learning Disability in Reading Fluency Skills and his diagnosed Auditory Processing Disorder (as noted by Maxine Young, Au.D., CCC-A/SLP, LLC as result of a Report of Independent Educational Evaluation of Auditory

15

Processing dated March 2020) in order to be successful. Furthermore, Mason will require specially designed instruction to address executive functioning deficits in the areas of working memory, plan/organize, and task-monitor." (Doc. 8-9, at 387). Fifth, Mason's 2020-2021 IEP also includes math testing and classroom accommodations, including cues to remain on task, extended time, and small group settings. (Doc. 8-9, at 390). Overall, despite Mason's Parents' assertions to the contrary, the 2020-2021 IEP includes the 2021 IEE recommendations of "specially designed instruction to address spelling skills, writing mechanics (punctuation, capitalization, sentence structure/grammar, etc.) and essay organization (i.e., sequencing, organization, theme development)." (Doc. 39, at 13). In sum, the 2020-2021 IEP and the 2021 IEE are consistent, and as such, the Hearing Officer's Decision is also consistent with the 2021 IEE.

B. CHILD FIND OBLIGATIONS

The parties dispute whether the administrative record shows Child Find violations. (Doc. 29, at 24-25; Doc. 32, at 30). Plaintiffs argue that the Hearing Officer's dismissal of the Child Find claim was erroneous and asks this Court to reverse that decision. (Doc. 29, at 24-25). The District responds that the administrative record does not support a Child Find violation because the District properly evaluated Mason over many years. (Doc. 32, at 30).

"'School districts have a continuing obligation under the IDEA and § 504'—called 'Child Find'—'to identify and evaluate all students who are *reasonably suspected* of having a disability under the statutes.'" *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012) (quoting *P.P.*, 585 F.3d at 738 (emphasis added); *accord* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111)). "The child-find obligation requires school districts to 'identif[y], locate[ ], and evaluate[ ]' all 'children with disabilities ... who are in need of special education and related

16

services.'" *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 137 (3d Cir. 2022) (citing 20 U.S.C. § 1412(a)(3)(A); 20 U.S.C. § 1401). A school district that has a reasonable suspicion or belief that a student has a disability has a reasonable amount of time to then evaluate that student for the specific problems they are suspected of having. *J.M.*, 39 F.4th at 137 ("Once a school district has such a reasonable suspicion that a child has a disability, it has a reasonable time to evaluate 'the specific problems a potentially disabled student is having.'") (quoting *D.K.*, 696 F.3d at 250).

The evaluation must address all suspected areas of disability. *J.M.*, 39 F.4th at 137. However, evaluations need not be exhaustive of all possibilities. *D.K.*, 696 F.3d at 250. ("But while an evaluation should be tailored to the specific problems a potentially disabled student is having, it need not be designed to identify and diagnose every possible disability."). Additionally, "[a] school's failure to diagnose a disability at the earliest possible moment is not *per se* actionable, in part because some disabilities 'are notoriously difficult to diagnose and even experts disagree about whether [some] should be considered a disability at all.'" *D.K.*, 696 F.3d at 249 (quoting *A.P. ex rel. Powers v. Woodstock Bd. of Educ.,* 572 F.Supp.2d 221, 226 (D. Conn.2008)); *see also P.P.,* 585 F.3d at 738 ("those areas were not identified as suspected disabilities and so were properly excluded from the ER"); *Ridley Sch. Dist.*, 680 F.3d at 273 (affirming a district court's finding of no Child Find violation because "[t]he IDEA does not require a reevaluation every time a student posts a poor grade"). A parent's disagreement with the outcome of testing does not render that testing inadequate. *See D.K.*, 696 F.3d at 251 (noting that parents' dissatisfaction with the extent of testing did not mean it was not compliant with Child Find procedural obligations); *see also P.P.,* 585 F.3d at 738.

Further, Child Find obligations can be satisfied by providing non-special education services, such as specialist instruction and classroom and testing accommodations, even where a student is not found to have an eligible disability by evaluations. *D.K.*, 696 F.3d at 252 (finding that a school's accommodations and extra assistance mitigated a Child Find violation).

Here, Hearing Officer dismissed the Child Find claim because "a Child Find violation ends when an LEA evaluates a student who is suspected of having a disability." (Doc. 8-3, at 7). Plaintiffs correctly assert that this is a legal error. (Doc. 29, at 22). A Child Find claim is not possible to assert even after the District conducts an evaluation. *See J.M.*, 39 F.4th at 137 (noting that an evaluation should address all suspected areas of disabilities, suggesting inadequate evaluations could lead to Child Find violations); *D.K.*, 696 F.3d at 250 ("a poorly designed and ineffective round of testing does not satisfy a school's Child Find obligations"); *H.D. by & Through Jeffrey D. v. Kennett Consol. Sch. Dist.*, No. CV 18-3345, 2019 WL 4935193, at *10-23 (E.D. Pa. Oct. 4, 2019) (discussing whether the adequacy of school's evaluations of student fulfilled its Child Find obligations). Despite the Hearing Officer's overbroad definition of how schools can satisfy their Child Find obligations, his conclusion that no Child Find violation occurred is still supported by the administrative record.

First, as described in the Hearing Officer's factual background section and corroborated by the record, the District repeatedly complied with Plaintiffs' requests to evaluate and re-evaluate Mason. (Doc. 8-7, at 16-18, 25; Doc. 8-8, at 4, 53, 55). While those evaluations did not lead to a finding of a specific learning disability, Plaintiffs argue that they expressed dissatisfaction with the extent of testing the District conducted during each evaluation. (Doc. 39, at 22). However, Mason's Parents' dissatisfaction with that testing does necessarily not mean it was inadequate. *See D.K.*, 696 F.3d at 251; *see also P.P.*, 585 F.3d at

18

738. The District not only tested Mason over several years with its own evaluators, but also agreed to cover the cost of independent evaluations on occasion for Mason, including a 2020 speech and language evaluation. (Doc. 8-8, at 5; Doc. 8-3, at 15; Doc. 32, at 10-11, 14). Yet, no independent evaluation found Mason eligible for special education services based on a specific disability due to his academic success prior to the August 2020 ER. (Doc. 8-3, at 12; Doc. 8-8, at 52; Doc. 32, at 9-10). The District did not violate Child Find obligations when various independent and school evaluators found him ineligible for services with a specific learning disability.

Second, the District did not neglect Mason's needs, but responded to them. Responding to a student's needs, even without providing special education services mitigates a Child Find violation. *See D.K.*, 696 F.3d at 252 ("the measures the School District did take to assist D.K. in the classroom militate against finding a Child Find violation. [. . .] It would be wrong to conclude that the School District failed to identify D.K. as a challenged student when it offered him [. . . extra assistance . . . ] and specialist attention en route to eventually finding a disability."). The District provided Mason with Title I services, and later, a reading intervention specialist. (Doc. 8-9, at 379; Doc. 29, at 9, 12-13). The record reflects consistent testing, both by the District's evaluators and independent evaluators, and extra assistance for Mason prior to identifying his specific disability. (Doc. 8-7, at 16-18, 25; Doc. 8-8, at 4, 53, 55; Doc. 8-9, at 379). "[A]ddressing [a student's] needs and providing appropriate instruction and interventions before rushing to special education identification" satisfies Child Find obligations. *Ridley Sch. Dist.*, 680 F.3d at 272. Mason's Title I reading services, a reading intervention specialist, several evaluations over several years, and placement in a co-taught classroom demonstrate that the District provided such appropriate supports before rushing to

a disability identification. (Doc. 8-7, at 16-18, 25; Doc. 8-8, at 4, 53, 55; Doc. 8-9, at 379);

*Ridley Sch. Dist.*, 680 F.3d at 272.

     C.    <u>FAPE OBLIGATIONS</u>

The parties dispute whether the administrative record shows FAPE violations. (Doc. 32, at 34; Doc. 39, at 11). Plaintiffs assert that Mason was not provided and continues to not be provided a FAPE, as evidenced by the more extensive diagnoses in the 2021 IEE. (Doc. 39, at 11). The District asserts that its provided Mason a FAPE during all times relevant to this action and also argues that the Hearing Officer's finding of a FAPE violation for the District's failure to have Mason's IEP in place at the start of the 2020-2021 school year should be reversed because Mason was never denied an educational benefit. (Doc. 34, at 7).

The IDEA requires the District to provide a FAPE to every eligible disabled student. *See Endrew F.,* 580 U.S. at 386 (citing 20 U.S.C. §§ 1401(26), (29)). What constitutes a FAPE, however, depends upon the needs of each child. The statutory definition of a FAPE includes "special education," or a specifically designed instruction to meet the child's unique needs, and "related services," or support services required to help the child benefit from such instruction. *See Endrew,* 580 U.S. at 386 (citing 20 U.S.C. §§ 1401(26), (29)). One way of providing a FAPE is through an IEP. *Endrew F.*, 580 U.S. at 386. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 404. But since progress for one student is different than progress for another student, the IEP must be "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F.*, 580 U.S. at 400. Moreover, "it cannot be determined whether an IEP was appropriate solely by evaluating a child's progress

20

or lack of progress under that IEP." *Colonial Sch. Dist.*, 2018 WL 2010915, at *11. Instead, "a court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made." *D.S.*, 602 F.3d at 564 (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995)). In addition, an "IEP need not aim for grade-level advancement" if such a goal "is not a reasonable prospect for a child." *Endrew F.*, 580 U.S. at 402. Incremental progress can be considered meaningful, but a meaningful educational benefit must be more than *de minimis. See Endrew F.*, 580 U.S. at 402. "[A]t a minimum, the IEP must be reasonably calculated to enable a child to receive meaningful educational benefits in light of the student's intellectual potential." *D.S.*, 602 F.3d at 557 (internal quotations omitted). "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 389 (citing *Rowley*, 458 U.S. at 206–07). And "[t]he issue of whether an IEP is appropriate is a question of fact." *D.S.*, 602 F.3d at 564 (quoting *S.H.*, 336 F.3d at 271). The Third Circuit has determined that a dispute about the specific contents of an IEP is a substantive claim. *See, e.g., D.S.*, 602 F.3d at 565. Accordingly, it is evaluated based on whether the IEP provided a meaningful educational benefit. *See, D.S.*, 602 F.3d at 565.

Lack of an IEP when a child was later identified to have a disability does not necessarily mean a FAPE violation occurred. *See D.K.*, 696 F.3d at 252-253 (finding a student received a FAPE when he was provided with "special measures" to address struggles in school, despite not receiving special education services) (citing *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 314 (6th Cir. 2007)). Additionally, a parent's dissatisfaction or

disagreement with an evaluation's conclusion or services implementation is not always a FAPE violation. *M.C.*, 81 F.3d at 395-96 ("[a] difference of opinion as to the adequacy of an educational program is not equivalent to a complete and total failure to provide a child with an education"); *see also D.K.*, 696 F.3d at 252-253; *P.P.,* 585 F.3d at 739.

FAPE requirements under Section 504 and the ADA are materially the same as those under the IDEA. *See Richard S.*, 334 F. App'x at 509 n.1; *Gwendolynne S.*, 2021 WL 949483, at *14. To prevail on Section 504 and ADA FAPE claims, Plaintiffs must prove that: (1) the child was "disabled," (2) the child was "otherwise qualified" to participate in school activities, (3) the school district received federal funding; and (4) the child was "excluded from participation in or denied the benefits of the educational program receiving the funds, or was subject to discrimination under the program." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275–76 (3d Cir. 2014). Because the IDEA, Section 504, and FAPE claims relate to the same facts, the Court will address these FAPE claims together.

Even if the benefit was not optimal, Mason received meaningful educational benefit during from 2015 through the present, outside of the period from the start of the 2020-2021 school year through October 12, 2020. He received services, including Title I services, reading intervention services, co-taught regular and special education classes, ongoing evaluations and testing, and eventually, an IEP. (Doc. 8-7, at 16-18, 25; Doc. 8-8, at 4, 53, 55; Doc. 8-9, at 379). The Court will review each disputed time period below.

### 1.    2015 – Start of 2020-2021 School Year

The Hearing Officer determined that Mason did receive a FAPE from 2015 until the start of the 2020-2021 school year. (Doc. 8-3, at 29). The Hearing Officer's decision hinges on the fact that evaluations were timely and adequate, complying with procedural requirements

under the IDEA and Section 504 and reveals "no procedural flaw." (Doc. 8-3, at 29). The Hearing Officer correctly states that even if the 2018 ER was insufficient, the need for special education services is not dependent on the presence of a diagnosed disability but upon whether Mason required special education services "to derive a meaningful benefit from the school's education." (Doc. 8-3, at 29). The Hearing Officer notes that Mason's success with Title I services and that Mason's Parents requested the 2018 Evaluation only due to the conclusion of Title I services demonstrate that no further services or evaluations were needed prior to 2019. (Doc. 8-3, at 29-30). This is supported by the factual record demonstrating that Mason had struggles, particularly with letter reversals, but continued to do well and make progress with the services the school provided. (Doc. 8-3, at 12; Doc. 8-7, at 16-18, 25; Doc. 8-8, at 4, 52-53, 55; Doc. 8-9, at 379; Doc. 32, at 9-10).

Similarly, the 2019 IEE showed nearly identical conclusions to the 2018 ER, and thus the decision not to provide special education services during the 2018-2019 academic year was proper. (Doc. 8-3, at 30; Doc. 8-8, at 52). The Hearing Officer also found no FAPE violation during the 2019-2020 academic year, commending the District for its efforts to evaluate Mason despite pandemic obstacles and providing IEP-like services despite "no legal obligation to do so" due to his "not showing a need for special education." (Doc. 8-3, at 30). Once again, given the consistent evaluations and Mason's significant progress with non-special education services, the District fulfilled its FAPE obligations.

Despite an incomplete April 2020 ER, the District completed Mason's ER in August 2020, and found him eligible for special education services. (Doc. 8-3, at 31-32; Doc. 8-7, at 48). The August 2020 ER led to the implementation of his 2020-2021 IEP, which the record reflects adequately addressed struggles outlined not only by the District's experts and

23

evaluations, but also by the 2021 IEE, as discussed *supra*. (Doc. 8-9, at 377-453). Further, to the extent that Plaintiffs argue that Mason's anxiety disorder that the 2021 IEE discovered was not addressed adequately in his IEP or evaluated during previous evaluations, courts in this Circuit have rejected this argument. *See H.D.*, 2019 WL 4935193, at *15 ("If all students have certain educational needs associated with anxiety, or any other condition, those needs are not "unique," and special education is not called for"). To respond to his anxiety, the District also provided classroom accommodations, such as small group settings and testing accommodations. (Doc. 8-9, at 390). The Hearing Officer correctly concluded Mason received a FAPE prior to the start of the 2020-2021 school year.

### 2.    Start of 2020-2021 School Year – October 12, 2020

The Hearing Officer concluded that the District failed to provide Mason a FAPE from the start of the 2020-2021 school year until October 12, 2020 because of the District's failure to have Mason's IEP in place until October 12, 2020. (Doc. 8-3, at 32). The District submits that the Hearing Officer's conclusion that it violated FAPE when it failed to have Mason's IEP in place at the start of the 2020-2021 school year is incorrect because Mason did not experience a deprivation of his educational benefit. (Doc. 34, at 7). However, that is a conclusion not supported by law, and the District cites no on point caselaw for its argument.

The IDEA's requirements are strict and inflexible in regard to timelines. *See* 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a); *see also M.D. v. Colonial Sch. Dist.*, 539 F. Supp. 3d 380, 391 (E.D. Pa. 2021) (stating that an IEP must be in place at the start of the school year to satisfy IDEA obligations); *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1068 (D. N.J. 2011) ("[the IDEA] requires each LEA to have in effect an IEP at the beginning of each school year for each disabled child 'in the agency's *jurisdiction*.'") (internal citations

24

omitted). The District failed to finalize and implement Mason's IEP by the start of the 2020-2021 school year. (Doc. 8-3, at 32). The District did not put Mason's IEP in place until October 12, 2020. (Doc. 8-8, at 70-71). Therefore, the Hearing Officer correctly determined that the District failed to provide Mason a FAPE during the period from the start of the 2020-2021 school year through October 12, 2020.

### 3.    October 12, 2020 – Present

The parties dispute whether the 2020-2021 IEP provides Mason a FAPE. As explained *supra*, the 2020-2021 IEP addresses the need identified not only by the District's evaluations, but also the 2021 IEE. Further, Mason's IEP was amended as early as January 2021 to reflect additional needs found by the speech and language evaluation in December of 2020. (Doc. 8-9, at 377-453). While Plaintiffs express a desire for a more ideal educational design for Mason, an IEP need not perfect a student's education access. *See Endrew F.*, 580 U.S. at 389 (citing *Rowley*, 458 U.S. at 206–207). Plaintiffs do not articulate how Mason's current services impede him from accessing his education, nor do they respond to the argument that an IEP need not be ideal. The record reflects that Mason's 2020-2021 IEP has sufficiently acted as at least a floor.

### D.    COMPENSATORY EDUCATION AWARD

The parties dispute whether Plaintiffs should receive relief in the form of a compensatory education award, and if so, what the extent of that relief should be. (Doc. 29, at 29; Doc. 34, at 7). Plaintiffs request a compensatory education award larger than the Hearing Officer's award of one hour per day from the start of the 2020-2021 school year through October 12, 2020, citing their arguments for FAPE violations from 2019 through the present. (Doc. 39, at 24). Plaintiffs aver that "[t]hough Mason began demonstrating needs in

reading and writing very early in his kindergarten school year, Mason was in the second half of his fifth-grade school year (December of 2020) when the District implemented his first IEP. He is entitled to compensatory education from January 27, 2019 (mid-way through third grade, and the date two year prior to the filing of the Due Process Complaint) until such a time as the School District offers an IEP consistent with the findings of the unrebutted IEE." (Doc. 39, at 24). The District contends that no Child Find or FAPE violations occurred at all because Mason did not suffer an educational loss. (Doc. 34, at 9). Therefore, the District submits that the compensatory education award provided by the Hearing Officer should be reversed. (Doc. 34, at 9).

The IDEA grants district courts broad discretion in fashioning a remedy for a denial of a FAPE. 20 U.S.C. § 1415(i)(2)(C)(iii) (stating that the court "shall grant such relief as the court determines is appropriate"); *see Sch. Dist. of Phila. v. Post*, 262 F.Supp.3d 178, 197 (E.D. Pa. 2017). Relief for Section 504 and ADA claims will mirror relief for an IDEA claim in this context. *See Richard S.*, 334 F. App'x at 509 n.1 (IDEA claims and 504 claims are indistinguishable); *Gwendolynne S.*, 2021 WL 94483, at *14 (finding no ADA or 504 violations because IDEA claims failed); *E.D. ex rel. T.D. v. Colonial Sch. Dist.*, CIVIL ACTION NO. 09-4837, 2017 WL 1207919, at *15 (E.D. Pa. Mar. 31, 2017) ("We determined that, consistent with the hearing officer's conclusion, Plaintiffs have failed to show that E.D. was denied a FAPE during the 2006-07, and 2007-08 school years. As a result, Plaintiffs are not entitled to compensatory damages."). Determining what relief is warranted is a case-by-case analysis under which the "court will evaluate the specific type of relief that is appropriate to ensure that a student is fully compensated for a school district's past violations of his or her rights under the IDEA and develop an appropriate equitable award." *Ferren C.*, 612 F.3d at 720.

Compensatory education, or the "replacement of educational services the child should have received in the first place," is one possible remedy available for the deprivation of the right to a FAPE. *Ferren C. v. Sch. Dist. of Philadelphia*, 595 F. Supp. 2d 566, 577 (E.D. Pa. 2009) (quoting *Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)); *Lester H. v. Gilhool*, 916 F.2d 865, 872–73 (3d Cir. 1990). There is no requirement that "the district's behavior . . . rise to the level of slothfulness or bad faith" for compensatory education to be an appropriate remedy. *M.C.*, 81 F.3d at 397. Where compensatory education is warranted, the student "is entitled to [it] for a period equal to the period of deprivation, excluding the time reasonably required for the school district to rectify the problem." *M.C.*, 81 F.3d at 397.

Procedural violations of the IDEA, particularly in relation to the adequacy of an IEP, typically only justify prospective injunctive relief, not compensatory relief or tuition reimbursement. *C.H. v. Cape Henlopen Sch. Dist.,* 606 F.3d 59, 66 (3d Cir. 2010). However, "a school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE . . . if such violation causes substantive harm to the child or his parents." *C.H.*, 606 F.3d at 66. Substantive harm occurs when a party can establish, by a preponderance of the evidence, that "the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit." *C.H.*, 606 F.3d at 67 (quoting 34 C.F.R. § 300.513(a)(2)) (alteration in original).

The Hearing Officer found the District provided Mason with a FAPE during all times relevant to this action but for the period from the start of the 2020-2021 school year through October 12, 2020, when Mason was not provided with an IEP. (Doc. 8-3, at 32). This Court

agrees. Concluding that Plaintiff proved that the District denied a FAPE to Mason during this period, the Hearing Officer awarded one hour per day of compensatory education. (Doc. 8-3, at 32). While Plaintiffs aver that Mason continues to be denied FAPE due to substantive inadequacies of his IEP, the record does not indicate such inadequacies. (Doc. 39, at 25). In fact, his 2020-2021 IEP showed Mason making substantial progress in his goals and benchmarks. (Doc. 8-9, at 384, 400-401, 403-413, 434-440, 442-453).

The Court finds that the record is devoid of any additional procedural defects that rise to the level of substantial harm necessary to award the compensatory education sought beyond what the Hearing Officer awarded. Mason received meaningful educational benefit during the period from 2015-2021, outside of the period from the start of the 2020-2021 school year through October 12, 2020, even if the benefit was not optimal. This Court finds the Hearing Officer's FAPE determinations under the IDEA correct. As such, Plaintiffs are also not entitled to different or additional relief under the IDEA, Section 504, or the ADA. *See Richard S.*, 334 F. App'x at 509 n.1; *Gwendolynne S.*, 2021 WL 949483, at *14.

## IV.   CONCLUSION

Accordingly, Plaintiff's motion for judgment on the administrative record is **DENIED.** (Doc. 28). The District's motion for judgment on the administrative record is **GRANTED in part** as to the Child Find claims and FAPE claims outside of the period from the start of 2020-2021 School Year – October 12, 2020. (Doc. 33). The District's motion for judgment on the administrative record is **DENIED in part** as to the FAPE claim from the start of 2020-2021 School Year – October 12, 2020 and the compensatory education award. (Doc. 33). The Hearing Officer's decision is **AFFIRMED**, and the Clerk of Court is directed

to **CLOSE** this case.

An appropriate Order follows.


                                              **BY THE COURT:**


**Dated: September 6, 2024**            *s/ Karoline Mehalchick*
                                        **KAROLINE MEHALCHICK**
                                        **United States District Judge**